_____ FILED          _____ ENTERED
_____ LODGED         _____ RECEIVED

JAN 01 2017

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                                   DEPUTY

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA,

Plaintiff,

v.

LOBSANG DARGEY,

Defendant.

CR NO. **CR17-001 TS2**

**INFORMATION**

The United States Attorney charges that:

## I.   PRELIMINARY STATEMENT

1.     This matter involves defendant LOBSANG DARGEY's abuse of a federal immigration program that promotes foreign investment in this country, and DARGEY's misuse of the investment proceeds DARGEY collected from investors he recruited to the program. As discussed herein, DARGEY raised over $150 million from foreign investors by representing to the investors and to the United States that DARGEY would use the investment proceeds exclusively to complete certain real estate projects in the Puget Sound area. DARGEY and others represented that the investment proceeds would be used in accordance with the requirements of the immigration program, including the requirement that each investor's full capital investment be used solely for job-creating

United States v. LOBSANG DARGEY—Information - 1

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

activities in the proposed projects.  As a result of these representations, investors were led to believe that if they entrusted their money to DARGEY they would ultimately be entitled to permanent United States residency.

2. In fact, contrary to DARGEY's representations, and for his own personal benefit, DARGEY secretly funneled tens of millions of dollars in investor funds to uses not disclosed to the investors or to the United States.  This included DARGEY's secret use of investor funds for DARGEY's personal real estate projects unrelated to the investors' projects, and DARGEY's secret use of investor funds to pay the costs of DARGEY's organizations, such as expenses incurred in promoting the investments.  As DARGEY knew, his misuse of investor funds not only resulted in financial harm to investors, but also carried the potential to render the investors ineligible for the immigration benefits that DARGEY had represented would flow from the investments.

3. DARGEY's diversion of investor funds, coupled with his own failure to make tens of millions of dollars in promised financial contributions to the projects, resulted in gaping funding deficits for the investors' projects.  DARGEY filled these deficits by raising tens of millions of dollars from a lender and a new equity investor.  DARGEY, with the assistance of others, provided the lender and investor with fraudulent financial information, including altered bank statements and falsified balance sheets, to hide his misuse of immigrant investor funds and the resulting funding deficits.  DARGEY also raised money for two new real estate projects, and planned to secretly divert the newly-raised funds to his original projects to further address the deficits.

4. DARGEY's fraud was brought to an end only when the United States Securities and Exchange Commission obtained injunctive relief, an asset freeze, and the removal of DARGEY's authority over the projects.  As a result of DARGEY's conduct, United States Citizenship and Immigration Services ("USCIS") terminated DARGEY's role in the projects and rendered decisions unfavorable to his investors' immigration petitions.

United States v. LOBSANG DARGEY—Information - 2

## II.   BACKGROUND

**A.   The EB-5 Program**

5.   The United States administers a federal immigration program called the "Employment-Based Immigration Fifth Preference" program, which is more commonly known as the "EB-5" program.  The EB-5 program is intended to promote economic growth in the United States, primarily through new job creation, by encouraging foreign investment in this country.  The EB-5 program allows foreign nationals to obtain permanent United States residency (commonly known as "green card" status) by investing in qualifying American businesses.  Investors who comply with program requirements initially receive a grant of conditional permanent residency status for a two-year period.  After this period, the investor may petition for permanent residency.

6.   To obtain an EB-5 visa, the investor must satisfy three primary program requirements: (1) the investor must invest at least $1 million (hereinafter, the "capital contribution") in the United States; (2) the capital contribution must be made in a qualifying business known as a "new commercial enterprise," or "NCE"; and (3) the capital contribution must create or preserve full-time positions for at least 10 qualifying employees within two years.  The minimum amount of the capital contribution is reduced from $1 million to $500,000 if the NCE is located in an area designated as a "targeted employment area," which may be a rural or high-unemployment area.  USCIS, a component of the United States Department of Homeland Security, administers the EB-5 program.

7.   EB-5 investments are sometimes promoted by entrepreneurs seeking financing for projects such as real estate developments.  These promoters sometimes establish "regional centers," which are entities that promote EB-5 investments within a designated geographic area.  To obtain regional center status, the promoter must provide USCIS with materials describing the kinds of commercial enterprises that may operate under the regional center, and the types of jobs that will be created either directly or

United States v. LOBSANG DARGEY—Information - 3

1 indirectly as a result of the investments.  An immigrant investor may, but is not required
2 to, invest in an NCE affiliated with a regional center.

3       8.     Prospective immigrants who wish to participate in the EB-5 program must
4 file "I-526" petitions with USCIS.  An I-526 petition must establish that the immigrant
5 will more likely than not satisfy EB-5 program requirements.  For example, the petition
6 must show that the immigrant has invested (or is in the process of investing) the required
7 amount of funds in an NCE; that the funds come from a lawful source; and that the
8 investment will more likely than not create at least 10 qualifying jobs in the United
9 States.

10       9.     To make these showings, immigrant investors typically provide USCIS
11 with supporting materials, which may include a project business plan, a budget, and
12 applicable offering materials.  USCIS reviews and relies on these materials in
13 determining whether the I-526 application should be granted.  During the pendency of the
14 I-526 petition, the proposed project must proceed, in all material respects, in the manner
15 described in the I-526 petition and supporting materials.  If the actual project materially
16 diverges from the I-526 proposal before USCIS grants the petition and the immigrant
17 becomes a conditional permanent U.S. resident, USCIS may deny the I-526 petition.

18       10.    If USCIS approves an I-526 petition, the petitioner/immigrant receives
19 conditional permanent residency for a two-year period.  After two years, the immigrant
20 may file a second petition, known as an "I-829 petition," to remove the conditions on the
21 immigrant's residency status.  If the I-829 petition demonstrates the immigrant investor
22 has in fact invested the minimum amount of funds in the NCE; that the investment has
23 created at least 10 jobs; and that other program requirements are satisfied, the petition is
24 granted and the investor receives his or her "green card," or unconditional permanent
25 residency.

26       11.    A fundamental rule of the EB-5 program is that every dollar of each EB-5
27 investor's capital contribution must be invested directly in the entity directly responsible

28

United States v. LOBSANG DARGEY—Information - 4

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE
5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   for creating employment, which is known as the "job-creating enterprise," or "JCE."

2   Further, the full investment must remain at risk and be used for job-creation purposes in

3   that project.  If any portion of the $1 million (or $500,000) capital contribution is used for

4   a purpose other than the project, USCIS will deem the investment non-compliant with

5   EB-5 regulations.  In particular, no portion of the investor's capital contribution may be

6   used to pay regional center expenses, such as expenses associated with promoting the

7   EB-5 investment.  For example, in a well-known decision, USCIS ruled that an

8   investment did not comply with EB-5 requirements because portions of the $500,000

9   capital contributions were used to pay sales commissions to EB-5 investment brokers.

10  *See In re: Izummi*, USCIS Decision No. 3360 (July 13, 1998).

11  **B.      The Defendant and Path America**

12          12.     At all times material to the Information, defendant LOBSANG DARGEY

13  was a real estate developer and a resident of Bellevue, Washington.  DARGEY was the

14  owner of several Washington-based real estate development companies including Path

15  America LLC, Dargey Development LLC, and Dargey Enterprises LLC.

16          13.     On June 28, 2010, DARGEY submitted to USCIS applications requesting

17  that USCIS designate two regional centers.  The first proposed regional center, which

18  was called "Path America SnoCo LLC," was intended to promote EB-5-financed projects

19  in Snohomish County, Washington, particularly Everett, Washington.  On August 8,

20  2011, USCIS granted the application and designated Path America SnoCo as a regional

21  center.  The second proposed regional center, which was called "Path America KingCo

22  LLC," was intended to promote EB-5-financed projects in King County Washington.

23  USCIS initially denied the application, but on June 6, 2013, it granted regional center

24  status to Path America KingCo LLC.  Path America LLC, Dargey Development LLC,

25  Dargey Enterprises LLC, Path America SnoCo LLC, and Path America KingCo LLC are

26  collectively referred to below as "the Dargey Entities."

27

28  United States v. LOBSANG DARGEY—Information - 5

**C.      The Everett Farmer's Market Project**

14.      Following USCIS's approval of the Path America SnoCo regional center, DARGEY, with the assistance of others, began promoting a potential EB-5 project called Path America Farmer's Market ("PAFM"), a mixed-used building in Everett.  To promote the investment, DARGEY and others prepared a Business Plan, an economic analysis, a Private Placement Memorandum, a Subscription Agreement, an Escrow Agreement, and a Partnership Agreement (collectively, the "PAFM Offering Materials"). DARGEY distributed and caused to be distributed the PAFM Offering Materials to prospective immigrant investors with the intent that the investors would rely on them in making investment decisions, and would submit the materials to USCIS in support of their I-526 petitions.

15.      The PAFM Offering Materials provided that a prospective immigrant investor could purchase a limited partnership interest in PAFM LP (the NCE) for $545,000.  The $545,000 investment was made up of (a) a $500,000 capital contribution to PAFM LP payable into escrow, and (b) a $45,000 administrative fee payable to a DARGEY-affiliated entity in Hong Kong called Path America Asia Ltd. ("Path America Asia").

16.      The PAFM Offering Materials represented that DARGEY would use each $500,000 capital contribution to build the PAFM project in accordance with the Business Plan, and would use the $45,000 administrative fee to pay sales commissions and other expenses of the regional center connected to the EB-5 securities offering.  The PAFM Offering Materials also stated that Path America LLC would contribute $2.5 million to the PAFM project, and in return would receive an 80% equity interest in PAFM LP.

17.      DARGEY and a business associate established Path America Asia to promote the EB-5 investment to prospective Chinese investors.  Path America Asia formed relationships with Chinese sales agents.  Path America Asia and Path America LLC then entered into referral agreements with those agents.  Under the referral

agreements, Path America LLC agreed to pay commissions to the agents for each EB-5 investor the agents referred to the PAFM EB-5 investment.  Path America Asia also directly promoted PAFM to potential investors.  DARGEY attended and participated in presentations in China to prospective PAFM investors.

18.     Between March 2012 and August 2014, DARGEY, through Path America LLC and its employees and agents, raised $43.6 million from 80 immigrant investors for the PAFM project.  This included $40 million in capital contributions to be used exclusively to construct the PAFM project, and $3.6 million in administrative fees to cover the costs of the offering, including sales commissions.  The immigrant investors invested these funds with DARGEY in reliance on the representations DARGEY made in the PAFM Offering Materials, and on statements DARGEY and other Path America representatives made directly to the immigrant investors during investor sales presentations in China.

19.     Between March 2012 and August 2014, the immigrant investors, with DARGEY's participation and knowledge, submitted the PAFM Offering Materials to USCIS in support of their I-526 petitions.  In reliance on these materials, USCIS approved the I-526 petitions of PAFM investors.  After receiving their conditional residency status, PAFM investors then moved to the United States based on their expectation that they would ultimately receive unconditional permanent resident status.

20.     In addition to the $40 million in EB-5 financing, DARGEY solicited and obtained a $25 million construction loan from Voya Insurance and Annuity Company ("Voya") to fund the remaining cost of building the PAFM project.  As described more fully below, DARGEY made materially false and fraudulent statements to Voya, including providing Voya with an altered bank statement, to obtain this loan.

**D.     The Potala Tower Project**

21.     In or about October 2013, following USCIS's designation of Path America KingCo as a regional center, DARGEY began promoting an EB-5 project called the

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE
5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

"Potala Tower" project to potential immigrant investors. DARGEY and others created, and provided to the prospective investors, among other things, a Business Plan, an economic analysis, a Private Placement Memorandum, a Subscription Agreement, a Partnership Agreement, an Escrow Agreement, and a Construction Loan Agreement (collectively, the "Tower Offering Materials").

22.     The Tower Offering Materials provided that prospective EB-5 investors could purchase limited partnership interests in one of two proposed NCEs (named "Path America Tower, LP," and "Path Tower Seattle, LP" or, collectively, the "Tower NCEs") for $545,000. The $545,000 investment was made up of (a) a $500,000 capital contribution payable into escrow; and (b) a $45,000 administrative fee payable to Path America Asia in Hong Kong.

23.     The Tower Offering Materials stated that, after the Tower NCEs received the immigrant investors' capital contributions, the NCEs would loan these funds to Potala Tower Seattle LLC, a DARGEY-created entity, to construct the Tower project in accordance with the Business Plan. The Tower Offering Materials stated that DARGEY would use the immigrant investors' $45,000 administrative fees to pay commissions and other expenses related to the EB-5 offering.

24.     Between February 2014 and August 2015, DARGEY raised approximately $110 million from approximately 202 immigrant investors for the Tower project. This included approximately $101 million in capital contributions and approximately $9 million in administrative fees. The immigrant investors invested these funds in reliance on the representations DARGEY made in the Tower Offering Materials and on statements DARGEY and other Path America representatives made to them during presentations in China.

25.     Between February 2014 and August 2015, the immigrant investors, with DARGEY's participation and knowledge, submitted the Tower Offering Materials to USCIS in support of their I-526 petitions. In addition, on July 10, 2015, DARGEY,

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

through counsel, submitted the Tower Offering Materials to USCIS in support of a request that USCIS grant "exemplar" approval to the Tower Project. In submitting this request, DARGEY intended that USCIS would rely on the Tower Offering Materials and determine that the project satisfied EB-5 program requirements, and would apply that favorable determination as precedent in adjudicating the I-526 petitions of all of the Tower Project investors.

26. In addition to the EB-5 financing, DARGEY solicited financing for the Tower project from a Chinese investment company, Shanghai Binshun Investment Management Company ("Binjiang"). On or about August 20, 2015, Binjiang, in reliance on statements made by DARGEY about the financial condition of the Tower project, invested $30 million in the Tower project. Binjiang simultaneously invested an additional $30 million in two other DARGEY projects known as Path Othello and Path Shoreline in reliance on statements made by DARGEY about the financial conditions of those projects.

## COUNT 1
### (Conspiracy to Commit Wire Fraud)

**A.     The Conspiracy and the Scheme to Defraud**

27. Beginning at a time unknown, but no later than March 2012, and continuing through on or about August 24, 2015, at Bellevue, within the Western District of Washington, and elsewhere, LOBSANG DARGEY, together with others known and unknown, did conspire, confederate and agree, together and with each other, to commit an offense against the United States. Specifically, LOBSANG DARGEY, together with others known and unknown, with intent to defraud, knowingly devised a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises. To execute and attempt to execute the scheme and artifice to defraud, LOBSANG DARGEY knowingly transmitted and caused to be transmitted by wire communication in interstate and foreign commerce,

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  writings, signs, signals, pictures and sounds in violation of Title 18, United States Code,

2  Section 1343.

3         28.    The object of the conspiracy was to persuade investors and lenders to

4  entrust DARGEY with millions of dollars by falsely representing that DARGEY: (1)

5  would manage the EB-5 investors' investments in compliance with EB-5 program

6  requirements, and in a manner expected to result in the issuance of EB-5 immigrant visas

7  to the EB-5 investors, when in fact DARGEY knowingly managed the investments in

8  violation of EB-5 program rules and in a manner that could result in the denial of the

9  investors' visa applications; (2) would use the funds entrusted to him in accordance with

10 the PAFM and Tower Offering Materials for each respective project, when in fact

11 DARGEY used the funds contrary to the representations in those materials and for his

12 own personal benefit, and to the investors' detriment; and (3) would contribute millions

13 of dollars of his own funds to the projects, when in fact DARGEY made no financial

14 contribution to either project and lacked the financial means to do so.  Having misused

15 investor funds, and having failed to contribute to the projects as promised, DARGEY and

16 others then attempted to compensate for the resulting funding deficits by soliciting

17 additional financing from Voya and Binjiang that was not disclosed to investors, and by

18 using fraudulent documents such as falsified bank statements and altered financial

19 statements to induce those companies to provide financing to DARGEY.

20 **B.     False Representations Regarding EB-5 Compliance**

21        29.    It was part of the scheme and artifice to defraud that, in soliciting

22 prospective EB-5 investors, DARGEY represented that DARGEY would manage the

23 projects in accordance with EB-5 rules and in a manner that would result in the approval

24 of investors' EB-5 petitions.  DARGEY knew that the immigrant investors' primary

25 purpose in investing in both projects was to obtain green cards through the EB-5

26 program, and DARGEY encouraged investors to participate for this purpose.

27

28

United States v. LOBSANG DARGEY—Information - 10

1       30.    For example, in sales presentations to prospective Chinese investors,

2 DARGEY represented, and caused others to represent, that the projects came with a

3 "green card guarantee." Similarly, materials distributed to investors for the PAFM

4 project represented that Path America SnoCo investment vehicles would be "specifically

5 designed to meet the applicant's Form I-829 Petition for an Alien Entrepreneur to

6 Remove Conditions requirements." In addition, DARGEY promoted the investments

7 through a website promising to "assure that all EB-5 requirements are met." The Path

8 America Tower LP Limited Partnership Agreement represented that DARGEY would

9 "operate the Company in a manner designed to comply with legal and policy

10 requirements of the EB-5 program," and that he would "follow the business plan for the

11 project as submitted to USCIS."

12      31.    In fact, as detailed below, DARGEY knowingly used the EB-5 investors'

13 capital contributions for purposes other than those described in the PAFM and Tower

14 Offering Materials, otherwise knowingly managed the investments contrary to EB-5

15 requirements, and caused the projects to materially depart from the business plans in

16 numerous respects without informing investors or USCIS. DARGEY's conduct could

17 result in the denial of the investors' EB-5 visa petitions.

18 **C.    Misuse of Capital Contributions to Pay Commissions and Syndication Costs**

19      32.    It was further part of the scheme and artifice to defraud that DARGEY

20 falsely represented to the immigrant investors and USCIS that he would not use any

21 portion of investors' $500,000 capital contributions to pay sales agent commissions or

22 other expenses associated with recruiting EB-5 investors.

23      33.    For example, the Tower Private Placement Memorandum ("Tower PPM")

24 stated that "commissions or other fees shall not be payable out of the proceeds of the

25 Capital Contributions." Similarly, the PAFM Private Placement Memorandum ("PAFM

26 PPM") stated that "the [$45,000] administrative fee shall be used exclusively to pay,

27 where applicable, any finder or similar agency introduction fee." The PAFM Business

28

United States v. LOBSANG DARGEY—Information - 11

1  Plan budget and the Tower Business Plan budget made no allowance for any portion of

2  EB-5 capital contributions to be used to pay commissions or other offering expenses.

3       34.     Contrary to his representations, DARGEY secretly used investors' capital

4  contributions to pay commissions and other EB-investment offering expenses that

5  DARGEY classified as "syndication costs." The "syndication costs" included such

6  things as a $1.4 million payment towards the purchase of a Bellevue home for the

7  manager of Path America Asia, a $31,000 jewelry bill, and a $1,300 dinner bill, all of

8  which were associated with enticing new investors to invest in the projects. With respect

9  to PAFM, DARGEY paid approximately $3.7 million in sales commissions and

10  syndication costs out of PAFM investor capital contributions in addition to the $45,000

11  fee paid by each investor. With respect to the Tower, DARGEY paid approximately $7.8

12  million in commissions and syndication costs out of Tower investors' capital

13  contributions in addition to the $45,000 fee paid by each investor.

14       35.     DARGEY knew these payments were contrary to his representations to the

15  immigrant investors and USCIS, and further knew that by paying these offering expenses

16  with capital contributions, the immigrant investors could be rendered ineligible for EB-5

17  visas. Further, DARGEY provided investors with PAFM and Tower Offering Materials

18  falsely representing that capital contributions were not being used for commissions or

19  syndication costs. In providing these materials to investors, DARGEY knew and

20  intended that the investors would provide the materials to USCIS in support of their I-526

21  petitions.

22       36.     It was further part of the scheme and artifice to defraud that, even after

23  using millions of dollars of capital contributions to pay sales commissions, DARGEY

24  submitted and caused to be submitted to USCIS materials representing that he had not

25  done so. For example, DARGEY caused counsel to Path America to prepare a letter for

26  submission to USCIS in support of each Tower investor's I-526 petition representing that

27  "no portion of the investors' contributions has been or will be applied toward legal fees

28

or administrative/marketing costs of [the Tower], which are paid from the *separate $45,000 administrative fee.*" (Emphasis in original.)  Similarly, on or about July 10, 2015, DARGEY signed and caused to be submitted to USCIS a filing that falsely represented that "no portion of the investors' contributions has been or will be applied toward legal fees or administrative/marketing costs"; that "none of the investors' capital contributions will be used" for EB-5 offering expenses; and that all offering expenses would be paid from non-EB-5 sources.

**D.    Secret Diversions of EB-5 Investments to Other Projects**

37.     It was further part of the scheme and artifice to defraud that DARGEY represented to investors and USCIS that the investors' capital contributions would be used exclusively to develop the respective EB-5 projects.  For example, the PAFM PPM stated that "the proceeds of the Offering will be used by the Partnership to invest in the Projects described herein."  Similarly, the Tower PPM stated that the capital contributions "will be used to finance the construction, marketing and operations, financing, improvement and sale of the Project."  In addition, both projects' budgets represented that 100% of the EB-5 capital would be expended on specific items related to the actual construction and development of the PAFM and Tower projects.

38.     Contrary to his representations to investors and USCIS, and beginning with his receipt of the first PAFM capital contribution in April 2012, DARGEY secretly diverted a portion of the investors' capital contributions to DARGEY's other non EB-5 real estate projects.  Of the capital contributions the PAFM immigrant investors entrusted to DARGEY to construct the PAFM, DARGEY and others secretly diverted approximately $1.6 million to DARGEY's personal Kirkland project, $550,000 to his personal Potala Village Everett project, and $270,000 to another DARGEY project in Seattle known as Path Othello ("Othello").  None of these projects were approved EB-5 projects.

United States v. LOBSANG DARGEY—Information - 13

39.     Similarly, of the funds that immigrant investors entrusted to DARGEY to build the Tower project, DARGEY secretly diverted over $16 million to other projects. This included approximately $7.7 million diverted to a proposed DARGEY project in Shoreline known as Potala Shoreline ("Shoreline"); $6.4 million to DARGEY's Kirkland project, and $1 million to DARGEY's proposed Othello project.  In addition, DARGEY diverted $2.5 million from the Tower project to the PAFM project to make up for funding deficits in the PAFM project resulting from DARGEY's misuse of funds and failure to make equity contributions.

40.     DARGEY knew that his secret diversions could render the EB-5 investors ineligible for EB-5 visas because significant portions of their $500,000 investments had been used for purposes other than the EB-5 projects in which they had invested. However, DARGEY never disclosed to investors or USCIS that he had misused the funds in this manner.

41.     It was a further part of the scheme and artifice to defraud that, on or about February 27, 2015, to make these diversions appear legitimate, DARGEY simultaneously executed eight promissory notes purporting to memorialize debt obligations of the entities that had received the secret diversions.  The promissory notes were not secured, did not provide for any interest for the period between the time DARGEY had diverted the funds and the date of the note (which in some cases was nearly three years), and provided for future interest at the submarket rate of 3% per year.  Despite the supposed interest obligations on the promissory notes, DARGEY did not cause any interest to be paid or accrued on accounting documents for PAFM, the Tower Project, or the obligors on the promissory notes after he signed the promissory notes.  Furthermore, after executing the promissory notes, DARGEY continued to divert additional funds from the EB-5 projects to the obligors of the notes without amending the notes or issuing new notes from those obligors to reflect the additional diversions.

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

**E.     Misrepresentations Regarding Promised Equity Contributions**

42.     It was a further part of the scheme and artifice to defraud that DARGEY falsely represented in the PAFM and Tower Offering Materials that DARGEY, through Path America LLC, would make cash contributions of millions of dollars to the projects when, in fact, neither DARGEY nor Path America had the means or intention to do so.

43.     With respect to PAFM, DARGEY represented in the PAFM Offering Materials, including the Business Plan, that Path America LLC would make a $2.5 million cash contribution to the project in the first ten months, and that Everett Hospitality, a company DARGEY owned in part, would make an additional $3 million equity contribution over the first 16 months of the project.  In fact, neither Path America nor Everett Hospitality ever made any cash or other financial contribution to the PAFM project.

44.     DARGEY never disclosed to the immigrant investors or to USCIS that he had failed to make these contributions to PAFM.  To the contrary, DARGEY continued to distribute the PAFM Offering Materials to investors, and caused investors to submit the PAFM Offering Materials to USCIS, after Path America LLC and Everett Hospitality had failed to make the promised equity contributions.

45.     With respect to the Tower Project, DARGEY represented in the Tower Offering Materials that Path America LLC would make a $30 million equity contribution to the Tower project.  The Tower Business Plan stated that DARGEY, through Path America LLC, would contribute $14.2 million to purchase the land for the Tower project, and that Path America would contribute the remaining $15.8 million by January 2015.  In fact, Path America did not buy the land for the Tower project and never made any cash contribution to the Tower project.  Instead of using $14.2 million of Path America funds to purchase the land as promised, DARGEY caused Potala Tower Seattle LLC to finance the purchase through seller financing, resulting in millions of dollars of debt for the project not disclosed in the Tower Offering Materials to the detriment of immigrant

1   investors. DARGEY later paid off this debt using a portion of the immigrant investors'

2   capital contributions.

3         46.     DARGEY never disclosed to investors or USCIS that he had failed to make

4   the promised $30 million equity contribution. Further, on or about July 10, 2015,

5   DARGEY filed with USCIS the Tower Offering Materials representing that Path

6   America would make the $30 million equity contribution, when DARGEY knew that

7   Path America lacked the means to do so. DARGEY'S failure to contribute the equity

8   promised in the PAFM and Tower Offering Materials represented a material departure

9   from those materials that, if discovered by USCIS, could result in the denial of investors'

10  I-526 petitions.

11  **F.      DARGEY's Fraudulent Inducement of the Voya Loans**

12          **1.      Inducement of the $25 Million PAFM Loan**

13        47.     It was further part of the scheme and artifice to defraud that, to make up the

14  funding deficit resulting from DARGEY's misuse of PAFM project funds and failure to

15  contribute equity, DARGEY incurred significantly more construction debt than

16  represented to the immigrant investors to complete the PAFM project.

17        48.     Specifically, in or about November 2014, DARGEY incurred $25 million

18  dollars of secured debt on behalf of PAFM LP in the form of a construction loan from

19  Voya, even though the PAFM Offering Documents represented that the project would

20  incur only $13.3 million in construction debt. The increased debt obligation materially

21  diminished the value of immigrant investors' equity investments in PAFM LP and

22  represented a material departure from the PAFM Offering Materials that, if discovered by

23  USCIS, could result in USCIS denying investors' I-526 petitions. DARGEY never

24  disclosed to the immigrant investors or USCIS that the amount of construction debt

25  incurred was nearly double the amount of debt stated in the PAFM Offering Materials.

26        49.     It was further part of the scheme and artifice to defraud that DARGEY

27  made material misrepresentations to Voya and its agents about DARGEY's personal

28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  financial condition to induce Voya to make the $25 million loan to PAFM. As a

2  condition of the loan, Voya required that DARGEY personally guarantee the $25 million

3  loan through construction and stabilization of the project. To verify that DARGEY had

4  the financial means to satisfy the personal guarantee, Voya required DARGEY to

5  disclose his personal financial information, particularly information concerning his liquid

6  assets. DARGEY knew he did not have sufficient liquid assets to meet Voya's

7  requirements, and therefore, made numerous false statements about the value of his liquid

8  assets to deceive Voya into funding the construction loan.

9       50.    Specifically, DARGEY knowingly provided Voya and its loan broker,

10  Newmark Realty Capital ("Newmark"), with a false and fraudulent bank statement for

11  Path America Asia's Hong Kong bank account at Hong Kong Shanghai Bank

12  Corporation ("HSBC"). DARGEY altered or caused to be altered the HSBC statement to

13  make it appear that the account balance was in excess of $9.6 million, when in fact, as

14  DARGEY knew, the true value of the account was less than $450,000. DARGEY also

15  falsely represented to Newmark and Voya that the balance in the account had never fallen

16  below $2 million or $3 million.

17       51.    It was further part of the scheme and artifice to defraud that, after obtaining

18  the $25 million loan for PAFM, DARGEY provided fraudulent PAFM financial

19  statements to Newmark and Voya to conceal the fact that he had secretly diverted PAFM

20  funds to other DARGEY projects. As a term of the loan agreement, DARGEY was

21  required to provide quarterly financial statements to Voya and Newmark following the

22  closing of the loan. PAFM's financial statements contained entries revealing that PAFM

23  had diverted millions of dollars to other entities, including the Kirkland and Othello

24  projects. On or about April 28, 2015, and July 29, 2015, DARGEY directed a Path

25  America employee to alter the PAFM financial statements by removing the entries that

26  disclosed the secret diversions. At DARGEY's direction, the Path America employee

27

28

United States v. LOBSANG DARGEY—Information - 17

1    then affixed DARGEY's signature to the fraudulent financial statements and sent them to

2    Newmark.

3        **2.    Attempted Inducement of the $66 Million Tower Loan**

4        52.    It was further part of the scheme and artifice to defraud that, to make up the

5    funding deficit resulting from his misuse of Tower project funds and his failure to

6    contribute equity to the Tower project, DARGEY attempted to obtain a $66 million

7    secured loan from Voya, when the Tower Offering Materials had represented that the

8    project would incur only $36.6 million in construction loan debt.  The increased debt

9    obligation would have materially increased the risk of default by Potala Tower Seattle

10   LLC on its debt to the NCEs (thus resulting in financial losses to the immigrant

11   investors), and would have represented a material change that could cause USCIS to deny

12   investors' I-526 petitions.

13       53.    It was a further part of the scheme and artifice to defraud that DARGEY

14   provided materially false financial information to Voya in an effort to induce Voya to

15   loan $66 million to the Tower Project.  Specifically, on or about July 27, 2015, DARGEY

16   sent Voya a false and fraudulent Path America Asia HSBC bank statement that had been

17   altered at DARGEY's direction to make it appear as if the account contained $8.2 million

18   in liquid assets, when in fact the account balance was less than $400,000.  However,

19   DARGEY was ultimately unable to obtain the loan because the Securities and Exchange

20   Commission obtained injunctive relief prior to the closing of the loan.

21   **G.   DARGEY's Fraudulent Inducement of the Binjiang Investments in the
         Tower, Shoreline, and Othello Projects**

22

23       **1.    Concealment of the Secret Diversions**

24       54.    It was a further part of the scheme and artifice to defraud that, to further

25   make up the funding shortfall caused by DARGEY's misuse of Tower project funds and

26   failure to contribute equity to that project, DARGEY obtained $30 million of outside

27   equity financing not contemplated or disclosed by the Tower Offering Materials from

28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE
5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  Binjiang, a Chinese investment company.  DARGEY did not disclose Binjiang's

2  investment to the immigrant investors or USCIS.

3       55.    It was a further part of the scheme and artifice to defraud that, to obtain the

4  Binjiang investment, DARGEY altered the Potala Tower Seattle LLC balance sheet to

5  conceal from Binjiang the fact that DARGEY had diverted millions of dollars of Tower

6  investor funds to unauthorized uses.

7       56.    On or about June 4, 2015, a representative of Deloitte Touche Tomhatsu

8  Ltd. ("Deloitte"), which was performing due diligence on behalf of Binjiang, requested

9  that DARGEY produce a Potala Tower Seattle LLC balance sheet.  At that time, certain

10  entries on the Potala Tower Seattle LLC balance sheet revealed that DARGEY had

11  secretly diverted approximately $16.8 million in investor funds to unauthorized uses,

12  including the diversions to Kirkland, PAFM, Shoreline, and Othello described above.

13  Specifically, these entries (the "due from entries") stated that millions of dollars were due

14  to Potala Tower Seattle LLC from DARGEY's Kirkland, PAFM, Shoreline and Othello

15  projects.

16       57.    Shortly after receiving Deloitte's request for the Potala Tower Seattle LLC

17  balance sheet, and to conceal the fact that he had misused investor funds, DARGEY

18  directed Path America representatives to falsify Tower accounting records so that the

19  "due from" entries would appear not on the Potala Tower Seattle LLC balance sheet

20  (which Deloitte had requested) but instead on the balance sheet of Path America Tower

21  LP, (which Deloitte had not requested).  The movement of the "due from" entries to Path

22  America Tower LP was false and misleading because Potala Tower Seattle LLC, not Path

23  America Tower LP, had made the secret diversion payments.  Indeed, as discussed above,

24  just four months earlier, DARGEY had executed promissory notes reflecting that the

25  debts were due to Potala Tower Seattle, LLC.

26

27

28  United States v. LOBSANG DARGEY—Information - 19

1    **2.    False Representations Regarding Tower Equity**

2    58.    It was a further part of the scheme and artifice to defraud that DARGEY

3    falsely represented to Binjiang that the Dargey Entities had made millions of dollars in

4    equity contributions to the Tower project, when in fact they had not.  Binjiang required,

5    in exchange for its agreement to invest in the Tower project, that Path America contribute

6    no less than $15 million to the project.  During negotiations, DARGEY falsely

7    represented to Binjiang that he had previously paid $12 million to purchase the land for

8    the project, when, in fact, DARGEY had made no contribution to that purchase.

9    DARGEY and Binjiang agreed that Path America would make an additional $3 million

10   cash contribution to the project prior to the deal closing.

11   59.    The Tower Development Agreement provided that Path America LLC

12   would be reimbursed for "costs and expenses reasonably incurred" in connection with

13   developing the Tower project.  The Tower budget projected that this would amount to

14   $750,000 over the life of the project.  As of June 7, 2015, Path America LLC had already

15   been reimbursed $912,578 for direct overhead expenses actually incurred on behalf of the

16   project.

17   60.    On or about June 8, 2015, at DARGEY's direction, a Path America LLC

18   employee made a journal entry reflecting that DARGEY had incurred an additional $3.7

19   million in direct overhead expenses on behalf of Potala Tower Seattle LLC for which

20   DARGEY not been reimbursed.  In fact, as DARGEY well knew, the $3.7 million figure

21   was entirely fabricated, and had no relation to any expenses actually incurred by

22   DARGEY or the Dargey Entities.  DARGEY then directed the employee to convert the

23   fictitious $3.7 million reimbursement obligation into an equity credit in DARGEY's

24   favor.  These entries made it appear from the Potala Tower Seattle LLC financial

25   statements as if DARGEY had made the $3 million cash contribution to the Tower

26   project as agreed with Binjiang, when in fact he had made no contribution at all.  On or

27   about June 13, 2015, DARGEY caused a Path America employee to email the resulting

28

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  altered and fraudulent Potala Tower Seattle LLC balance sheet to the Deloitte

2  representative in China.

3      **3.    False Representations Regarding Shoreline Equity**

4      61.    It was a further part of the scheme and artifice to defraud that DARGEY

5  solicited and obtained $15 million investments from Binjiang in each of two additional

6  DARGEY developments, Shoreline and Othello, for a total of $30 million.  DARGEY

7  required Binjiang to invest in Shoreline and Othello as a condition to Binjiang investing

8  in the Tower project.  DARGEY intended to divert portions of the proceeds of Binjiang's

9  Shoreline and Othello investments to the Tower project to make up for the shortfalls

10  resulting from DARGEY's misuse of Tower funds and his failure to contribute equity to

11  the Tower project.

12      62.    In connection with Binjiang's investment in Shoreline, DARGEY falsely

13  represented to Binjiang that the Dargey Entities had contributed $8.5 million to the

14  Shoreline project.  The Binjiang Investment Agreement for Shoreline required DARGEY

15  to contribute $5 million in cash to the Shoreline project.  DARGEY falsely represented to

16  Binjiang that he had already contributed $8.5 million to the project, when in fact the only

17  funding of the project consisted of the $7.5 million in Tower EB-5 investor funds that

18  DARGEY had fraudulently diverted to the Shoreline project.

19      63.    In addition, on or about June 8 and 9, 2015, a Path America employee, at

20  DARGEY's direction, made entries in the Shoreline project's accounting system that

21  made it appear as if DARGEY or the Dargey Entities had (1) incurred and paid $500,000

22  in unreimbursed direct overhead expenses on behalf of the Shoreline project, when in fact

23  these overhead expenses had not been incurred or paid; and (2) earned $1 million in

24  developer fees, when in fact the Dargey entities were not entitled to, and had not earned,

25  any developer fees.  At DARGEY's direction, the employee then converted those

26  fictitious payment obligations to the Dargey entities into equity credits in favor of

27  DARGEY.  These entries made Shoreline's balance sheet appear as if DARGEY had

28

United States v. LOBSANG DARGEY—Information - 21

contributed $8.9 million to the project, when in fact he had made no financial contribution at all.  DARGEY caused the false and fraudulent Shoreline balance sheet to be emailed to Deloitte in China on or about June 13, 2015.

64.     DARGEY intended and expected that, as a result of his false claim that he had paid $3.5 million in equity more than the $5 million required under his agreement with Binjiang, DARGEY would under the terms of his agreement with Binjiang immediately receive a $3.5 million payment from Binjiang to "reimburse" him for his "excess" equity contribution, when in fact DARGEY had made no equity contribution at all.

### 4.     False Representations Regarding Othello Equity

65.     It was a further part of the scheme and artifice to defraud that DARGEY induced Binjiang to make an additional $15 million investment in the Othello project by falsely representing that the Dargey Entities had contributed $5.3 million to that project. The Binjiang Investment Agreement for Othello required DARGEY to make a $5 million cash contribution to the Othello project.  DARGEY falsely represented to Binjiang that he had already contributed $3 million to the project, when in fact the only funding of the project consisted of the $1 million in Tower EB-5 investor funds and the $270,000 in PAFM EB-5 investor funds that DARGEY had previously fraudulently diverted to the Othello project.

66.     In addition, on or about June 8 and 9, 2015, a Path America employee, at defendant's direction, recorded entries in the Othello project's accounting system that made it appear as if DARGEY or the Dargey Entities had (1) incurred and paid $1.5 million in direct overhead expenses on behalf of the project, when in fact these overhead expenses had not been incurred or paid; and (2) earned $2.5 million in developer fees, when in fact the Dargey entities had not earned, and were not entitled to, any developer fees.  At DARGEY's direction, the employee then converted those fictitious payment obligations to the Dargey entities into equity credits in favor of DARGEY, making it

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  appear from the balance sheet as if DARGEY had made the equity payments required by

2  the Othello Investment Agreement, when in fact he had made no payments at all.

3  DARGEY caused the false and fraudulent Othello balance sheet to be emailed to Deloitte

4  in China on June 13, 2015.

5  **H.    Overt acts**

6       67.    In furtherance of the conspiracy and to effect its objects, within the Western

7  District of Washington and elsewhere, LOBSANG DARGEY, together with other

8  individuals, committed and caused to be committed, among others, the following overt

9  acts, which are representative of the various overt acts undertaken in furtherance of the

10  fraud:

11       a.    On or about April 2, 2013, LOBSANG DARGEY caused $200,000

12  of the capital contribution of D.L., a Path America Farmer's Market investor, to be used
to pay expenses of LOBSANG DARGEY's Kirkland project by means of an interstate

13  and foreign wire transmission;

14       b.    On or about August 19, 2014, LOBSANG DARGEY caused a

15  falsified HSBC bank statement to be transmitted to Newmark Realty Capital by means of
an interstate and foreign wire transmission;

16       c.    On or about August 20, 2014, LOBSANG DARGEY caused

17  $325,000 of the capital contributions of Path America Farmer's Market investors to be
used to pay agent sales commissions by means of an interstate and foreign wire

18  transmission;

19       d.    On or about November 3, 2014, LOBSANG DARGEY caused

20  $1,402,454 of the capital contributions of Potala Tower investors to be applied toward the
purchase of a residence for an officer of Path America Asia by means of an interstate and

21  foreign wire transmission;

22       e.    On or about November 14, 2014, LOBSANG DARGEY caused

23  $90,000 of the capital contributions of Potala Tower investors to be used to pay
syndication costs incurred by Path America Asia by means of an interstate and foreign

24  wire transmission;

25       f.    On or about May 13, 2015, LOBSANG DARGEY caused

26  $6,000,000 of the capital contributions of Potala Tower investors to be used to purchase
land for LOBSANG DARGEY's Shoreline project by means of an interstate and foreign

27  wire transmission; and

28

United States v. LOBSANG DARGEY—Information - 23

g.      On or about June 13, 2015, LOBSANG DARGEY caused the transmission of an altered Potala Tower Seattle balance sheet to Deloitte Touche Tomhatsu, which was conducting due diligence on behalf of Shanghai Binshun Investment Management Company by means of an interstate and foreign wire transmission.

All in violation of Title 18, United States Code, Section 371.

## COUNT 2
### (Scheme to Conceal Information From the United States)

68.     Paragraphs 1 through 67 are hereby incorporated by reference as if fully set forth herein.

69.     Beginning at a time unknown, but no later than March 2012, and continuing through on or about August 24, 2015, at Bellevue, within the Western District of Washington, and elsewhere, LOBSANG DARGEY, in a matter within the jurisdiction of the United States Department of Homeland Security, United States Citizenship and Immigration Services, did falsify, conceal, and cover up by any trick, scheme, artifice and device material facts, to wit, the facts that:

a.      LOBSANG DARGEY had secretly diverted capital contributions of EB-5 investors in the Path America Farmer's Market project to other LOBSANG DARGEY projects, including the Kirkland, Potala Village Everett, Tower, and Othello projects;

b.      LOBSANG DARGEY had secretly diverted capital contributions of EB-5 investors in the Path America Farmer's Market project to pay agent sales commissions and other expenses associated with promoting the Path America Farmer's Market EB-5 investment;

c.      LOBSANG DARGEY had secretly diverted capital contributions of EB-5 investors in the Potala Tower Project to other LOBSANG DARGEY projects, including the Kirkland, Potala Village Everett, PAFM, and Othello projects; and

///

///

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

      d.     LOBSANG DARGEY had secretly diverted capital contributions of

2

EB-5 investors in the Potala Tower Project to pay agent sales commissions and other expenses associated with promoting the Path America Tower EB-5 investment.

3

     All in violation of Title 18, United States Code, Section 1001(a)(1) and Section 2.

4

5

6

7

_____

ANNETTE L. HAYES

8

United States Attorney

9

_____

10

ANDREW FRIEDMAN

11

Assistant United States Attorney

12

_____

13

JUSTIN W. ARNOLD

14

Assistant United States Attorney

15

_____

16

SETH WILKINSON

17

Assistant United States Attorney

18

19

20

21

22

23

24

25

26

27

28

United States v. LOBSANG DARGEY—Information - 25